24CA0594 Peo in Interest of JXS 11-14-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0594
Arapahoe County District Court No. 22JV30147
Honorable Victoria Klingensmith, Judge

---

The People of the State of Colorado,

Petitioner,

In the Interest of J.S., a Child,

and Concerning M.W.,

Appellant

and

S.H.,

Appellee.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE LIPINSKY
J. Jones and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

---

Alison A. Bettenberg, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant

Lindsey Parlin, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellee

¶ 1    M.W. (father) appeals the juvenile court's judgment allocating parental responsibilities for J.X.S. (the child) to S.H-M. (mother). We reverse and remand with directions.

## I.    Background

¶ 2    The Arapahoe County Department of Human Services filed a petition in dependency and neglect regarding the then-seven-year-old child and several of his half- and step-siblings.  In the petition, the Department alleged that F.S. Jr. (stepfather) threw a phone at one of the child's half-siblings, resulting in an injury that required stitches.  The Department also alleged that mother and stepfather told the children to lie about the incident.

¶ 3    The Department confirmed that physical discipline was often used in the home.  Although it initially attempted to keep the children in the home, the Department received reports of ongoing domestic violence incidents involving mother and stepfather.  For this reason, the Department removed the children from the home. The Department initially placed the child and his half-siblings with maternal relatives.

¶ 4    Father, who had little relationship with the child at the time the Department filed the petition, entered a "no-fault" admission to

the petition. The juvenile court adjudicated the child dependent and neglected and adopted a treatment plan for father. Mother and stepfather also admitted to the petition's allegations, and the court adopted treatment plans for them, as well.

¶ 5 About four months after the Department filed the petition, father moved to have the child placed with him. Before the juvenile court could hold a hearing on father's motion, however, maternal relatives informed the Department they could no longer serve as a placement for the children. The child moved in with father, where he stayed for the remainder of the proceedings.

¶ 6 Mother and stepfather eventually complied with their treatment plans, and the Department returned the child's siblings to mother and stepfather's home. At the Department's request, the juvenile court set a contested allocation of parental responsibilities (APR) hearing concerning the child.

¶ 7 At the hearing, the caseworker testified that, after the child moved in with father, the Department supervised mother's parenting time because no suitable family or friends were available or willing to supervise. The caseworker testified that the child consistently reported that he was afraid of stepfather and did not

want to see him, although he had recently changed his mind because stepfather had been "buying him things." The caseworker also said that neither mother nor stepfather was able to acknowledge the child's fear of stepfather.

¶ 8 For these reasons, although the Department approved unsupervised parenting time for mother, it put in place a safety plan requiring that stepfather not be present during mother's parenting time. Nonetheless, the child reported that stepfather was present during mother's parenting time. As a result, the court imposed a stricter safety plan that required mother to submit an itinerary and to send a photo of her and the child at the visit and required stepfather to send a photo showing he was at a separate location during mother's parenting time. The caseworker testified that, on one occasion, she "drop[ped] in" to mother's parenting time to ensure stepfather was not present.

¶ 9 The court consistently reiterated the safety plan to mother, even informing her that, until it ruled on the APR issue, stepfather "better not be present" during mother's parenting time. The caseworker also testified that father attempted to dictate how and

when mother's parenting time would occur and frequently prevented the child from attending visits with mother.

¶ 10    The Department also placed referrals for family therapy for the child and stepfather, but no providers picked up the referral. One referral, the Trauma Support Program (TSP), said it would not do family therapy with the child and stepfather because stepfather "had not yet taken accountability" for the child's feelings. The caseworker testified that she contacted stepfather's therapist to start working on accountability with respect to the child so stepfather and the child could work towards getting into family therapy. However, stepfather did not reach a point where TSP was willing to proceed with family therapy.

¶ 11    After those "failed attempts" at family therapy, the caseworker placed a referral for reintegration therapy. The reintegration therapist testified that, after performing an intake for the child, she did not recommend reintegration therapy because the child was not ready for it. She testified that, when she suggested the child see stepfather, the child had "rapid breathing, his stutter got worse, his eyes widened, he was like 'No. I don't want to see him.' He was

very adamant in that." The caseworker also indicated that father thwarted the Department's efforts to begin reintegration therapy.

¶ 12 The Department and the child's guardian ad litem (GAL) both took the position at the APR hearing that mother and father were safe, and that the child should have time with both parents. The Department and the GAL provided no recommendations for the allocation of parenting time, however. The GAL said that reintegration therapy needed to happen before the child had time with stepfather.

¶ 13 Following the hearing, father submitted a proposed APR order that granted him sole decision-making responsibility and made him the child's primary custodial parent. His proposed order also said that mother would have supervised parenting time, at her expense, twice a week and, after having consistent visits for a sixty-day period, her parenting time would move to unsupervised visits. Father's proposed order further said that stepfather could not be present at any visits and that overnight visits would be at the discretion of a reintegration therapist. His proposed order did not require such therapy, however.

¶ 14    Mother's proposed APR order granted her sole decision-making responsibility for the child and said she was the child's primary custodian. In addition, mother's proposed order provided that father would have parenting time every other weekend and a week-on, week-off schedule during the summer. It did not address stepfather's presence or reintegration therapy, however.

¶ 15    Although the juvenile court set a hearing for an oral ruling, it does not appear from the record that one occurred. Rather, the court signed mother's proposed APR order with no additional findings. Father appeals the APR judgment. The GAL agrees with father that the APR judgment should be reversed.

## II.    Analysis

¶ 16    Father and the GAL challenge the juvenile court's judgment because it lacks factual findings supporting the court's determination to allocate sole decision-making responsibility and primary residential custody to mother. They also assert that, without any explanation, the judgment improperly reduces father's parenting time and that the judgment is not in the child's best interests because it does not address the child's time with stepfather.

¶ 17    We agree that the court's judgment must be reversed because it neither addresses the child's best interests nor provides any factual findings supporting the court's parenting time allocation.

### A.    Standard of Review and Relevant Law

¶ 18    The juvenile court has exclusive jurisdiction to determine the custody of a child who is subject to the juvenile court's exclusive jurisdiction under the Children's Code.  § 19-1-104(1)(c), C.R.S. 2024.

¶ 19    After a child is adjudicated dependent or neglected, the juvenile court must "hear evidence on the question of the proper disposition best serving the interests of the child and the public." § 19-3-507(1)(a), C.R.S. 2024.  The juvenile court is also authorized to "place the child in the legal custody of one or both parents or the guardian, with or without protective supervision, under such conditions as the court deems necessary and appropriate." § 19-3-508(1)(a), C.R.S. 2024.

¶ 20    Because the overriding purpose of the Children's Code is to protect a child's welfare and safety by providing procedures to serve the child's best interests, the court must allocate parental

responsibilities in accordance with the child's best interests. *L.A.G. v. People in Interest of A.A.G.*, 912 P.2d 1385, 1391-92 (Colo. 1996).

¶ 21    Adjudications regarding the allocation of parenting time and decision-making responsibilities are within the court's discretion, and we will not disturb them on review if competent evidence supports the court's judgment. *See People in Interest of A.M.K.*, 68 P.3d 563, 565 (Colo. App. 2003). However, a juvenile court's judgment must contain factual findings and legal conclusions sufficiently explicit to give an appellate court a clear understanding of the basis of its judgment and to enable the appellate court to determine the grounds on which it rendered its decision. *See In re Marriage of Rozzi*, 190 P.3d 815, 822 (Colo. App. 2008).

## B.    Discussion

¶ 22    The juvenile court made no factual findings in support of its decisions to allocate sole decision-making responsibility to mother, make her the primary parent, or allow father parenting time only every other weekend. Moreover, the court did not address the child's fear of stepfather, family therapy, or reintegration therapy. In sum, the court did not make *any* factual findings related to the disputes that were the subject of the hearing or explain why its APR

8

judgment was in the best interests of the child. Therefore, we lack a clear understanding of the basis of the APR judgment. *See id.* at 822.

¶ 23 Mother argues that the judgment was sufficient because "there is no indication that the juvenile court failed to consider the purposes of the children's code." However, nothing in the judgment indicates that the court considered the purposes of the Children's Code or what facts it found credible and used to support its decision to move the child to mother's home, where stepfather also lived.

¶ 24 Mother also contends that the evidence before the juvenile court was "clear, consistent, and unequivocal" that the child had not thrived under father's care, and that father had wrongfully prevented mother from seeing the child throughout the case and refused to follow court orders. Mother does not cite the record or any authority in support of these contentions, however. In any event, we disagree with mother's contentions.

¶ 25 Although evidence supported a finding that, at times, father refused to allow the child to visit mother, other evidence showed that mother did not fully comply with the Department's safety plan

during her visits with the child, and stepfather only once sent a photo verifying his whereabouts during one of mother's visits.

¶ 26 Mother also asserts that the child had lived with her all of his life and had no relationship with father before the Department filed the petition; the Department concluded that, after June 2023, she no longer needed supervised visits; father had a previous domestic violence conviction, for which he received no treatment; and father thwarted the Department's attempts at reintegration therapy. Although we agree that portions of the record could support some, if not all, of these assertions, the record also contains contrary evidence. It is for the juvenile court — not for an appellate court — to resolve conflicts in the record. *See In re Marriage of Bowles*, 916 P.2d 615, 617 (Colo. App. 1995) ("The trial court as a finder of fact can believe all, part, or none of a witness's testimony, even if uncontroverted.").

¶ 27 In addition, mother argues that nothing prohibited the juvenile court from imposing the parenting time schedule set forth in the judgment. However, it could not do so without making sufficiently explicit factual findings and legal conclusions to provide us with a

clear understanding of the basis of the judgment. *See Rozzi,* 190 P.3d at 822.

¶ 28 In the absence of any factual findings by the juvenile court, including any discussion of the child's best interests, we are unable to determine the basis for the provisions of the APR judgment. Thus, we are unable to determine whether the court applied the proper legal standard and whether sufficient evidence supports the judgment. As a result, we reverse the APR judgment.

### III. Disposition

¶ 29 The APR judgment is reversed, and the case is remanded to the juvenile court for reconsideration. On remand, we direct the juvenile court to make factual findings and legal conclusions to support the judgment it ultimately imposes. It may, at its discretion, take additional evidence regarding the child's current circumstances and other relevant issues.

JUDGE J. JONES and JUDGE SULLIVAN concur.

11